**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RONALD C. MCCRAY, JR.,<br>*Plaintiff,*<br>v.<br>JOSEPH R. BIDEN, JR.,<br>*Defendant.* | Civil Action No. 21-2882 (RDM) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ronald McCray, Jr., who is proceeding *pro se*, seeks to enjoin the enforcement of two presidential executive orders—Executive Order 14,042 and Executive Order 14,043—which, respectively, direct federal agencies to require COVID-19 vaccination for federal contractors and employees. Before the Court is Plaintiff's motion for a temporary restraining order ("TRO") against the President, Dkt. 2.

Plaintiff maintains that "COVID-19 statistics are meaningless as they are based [on] false representations of material facts" and so, he claims, "there is no COVID-19 emergency as portrayed by CDC and WHO." Dkt. 9 at 4. Plaintiff's complaint and his motion for a TRO challenge the President's Executive Orders on four grounds: first, that the orders are "invalid" because, he claims, the "declaration of [a] public health emergency" for COVID-19 was "fraudulent," Dkt. 1 at 115 (Compl. ¶ 114), and violated the Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3(b), Dkt. 1 at 113 (Compl. ¶¶ 109–11); second, that the orders violate substantive due process by burdening Plaintiff's fundamental rights to privacy and bodily integrity, Dkt. 1 at 115–23 (Compl. ¶¶ 115–37); third, that the orders infringe upon Plaintiff's equal protection rights because the orders treat individuals with natural immunity differently

from individuals with vaccine-induced immunity, *id.* at 123–26 (Compl. ¶¶ 138–46); and fourth, that the orders are "arbitrary, unlawful, contrary to constitutional rights, unsupported by substantial evidence, and without observance of procedure," in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2), Dkt. 1 at 126–27 (Compl. ¶¶ 146–53).

For the reasons set forth below, the Court concludes that it lacks subject-matter jurisdiction over this dispute because it has no power to enjoin the President and because Plaintiff's claims are not yet ripe for adjudication. Accordingly, the Court will **DENY** Plaintiff's motion for a TRO, Dkt. 2, and will **DISMISS** Plaintiff's complaint, Dkt. 1, without prejudice.

## I. BACKGROUND

### A. The COVID-19 Pandemic and Executive Orders 14,042 and 14,043

COVID-19 is an infectious respiratory disease caused by the SARS-CoV-2 novel coronavirus. *Coronavirus disease (COVID-19)*, World Health Org., https://www.who.int/health-topics/coronavirus#tab=tab_1 (last visited Dec. 7, 2021). Since early 2020, the COVID-19 pandemic has resulted in widespread disruption, upheaval, and tragedy across the country and the globe. To date, more than 49 million Americans have contracted the virus, causing more than 3.4 million hospitalizations and 785,000 deaths. *See COVID Data Tracker*, Cts. for Disease Control & Prevention, https://covid.cdc.gov/covid-data-tracker (last visited Dec. 7, 2021). The pandemic, moreover, has persisted over time; despite being more than a year and a half into the crisis, in the past week, the United States reported over 726,000 new cases of COVID-19. *Id.*

The emergence of COVID-19 led the Secretary of Health and Human Services to declare a public health emergency under 42 U.S.C. § 247d(a) in January 2020 and the President to declare a national emergency in March 2020. *See* Declaring a National Emergency Concerning

the Novel Coronavirus (COVID-19) Outbreak, Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 13, 2020).

Shortly after the inception of the pandemic, scientists began a concerted effort to develop an effective vaccine to combat the virus. Generally, before a vaccine may be distributed to the public, the Food and Drug Administration ("FDA") must review and approve the product as safe and effective. *See* 42 U.S.C. § 262(a)(2)(C); 21 C.F.R. § 600.3(s). A notable exception to this approval process, however, comes in the form of "emergency use authorization." Under the Food, Drug, and Cosmetic Act, the FDA may grant "emergency use authorization" to a medical product, such as a vaccine, which permits the product to be distributed to the public during a public health emergency, for the purpose of combatting that emergency, before the product has received final approval from the FDA. 21 U.S.C. § 360bbb-3.

In March 2020, the Secretary of Health and Human Services determined that "circumstances exist justifying the authorization of emergency use of drugs and biological products during the COVID-19 pandemic." Emergency Use Authorization Declaration, 85 Fed. Reg. 18250, 18250 (Apr. 1, 2020). Based on this declaration, the FDA later issued emergency use authorizations for three vaccines: the Pfizer-BioNTech and Moderna vaccines in December 2020, and the Janssen vaccine in February 2021. *See* Press Release, Food & Drug Admin., FDA Takes Key Action in Fight Against COVID-19 By Issuing Emergency Use Authorization for First COVID-19 Vaccine (Dec. 11, 2020), https://www.fda.gov/news-events/press-announcements/fda-takes-key-action-fight-against-covid-19-issuing-emergency-use-authorization-first-covid-19; Press Release, Food & Drug Admin., FDA Takes Additional Action in Fight Against COVID-19 By Issuing Emergency Use Authorization for Second COVID-19 Vaccine (Dec. 18, 2020), https://www.fda.gov/news-events/press-announcements/fda-takes-

additional-action-fight-against-covid-19-issuing-emergency-use-authorization-second-covid; Press Release, Food & Drug Admin., FDA Issues Emergency Use Authorization for Third COVID-19 Vaccine (Feb. 27, 2021), https://www.fda.gov/news-events/press-announcements/fda-issues-emergency-use-authorization-third-covid-19-vaccine. On August 23, 2021, the FDA gave full approval to the Pfizer-BioNTech COVID-19 vaccine for people aged 16 years and older. Press Release, Food & Drug Admin., FDA Approves First COVID-19 Vaccine (Aug. 23, 2021), https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine.

On September 9, 2021, President Biden issued two executive orders setting forth COVID-19 vaccination requirements for federal employees and contractors. *See* Exec. Order No. 14,043, 86 Fed. Reg. 50989 (Sept. 14, 2021) (federal employees); Exec. Order No. 14,042, 86 Fed. Reg. 50985 (Sept. 14, 2021) (federal contractors). Executive Order 14,042 directs federal agencies to

> ensure that contracts and contract-like instruments . . . include a clause that . . . the contractor and any subcontractors shall, for the duration of the contract, comply with all guidance for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force . . . , provided that the Director of the Office of Management and Budget . . . approves the Task Force Guidance and determines that the Guidance . . . will promote economy and efficiency in Federal contracting.

86 Fed. Reg. 50985.[1] Under the terms of the President's Executive Order, the mandate applies only to new contracts and extensions, renewals, and exercises of options on existing contracts, although agencies are "strongly encouraged, to the extent permitted by law," to ensure that the

[1] Executive Order 14,042 invokes the President's powers under the Procurement Act, 40 U.S.C. § 121, as the source of his authority to issue the order.

safety protocols required under "all existing contracts" are "consistent with the requirements specified in . . . th[e] order." *Id.* at 50987.

On September 24, 2021, the Safer Federal Workforce Task Force (the "Task Force") issued guidance that all "covered contractor employees" obtain "COVID-19 vaccination . . . , except in limited circumstances where an employee is legally entitled to an accommodation." Safer Federal Workforce Task Force Guidance for Federal Contractors and Subcontractors on COVID-19 Workplace Safety 1 (updated Nov. 10, 2021) ("Federal Contractor Guidance"); *see* 86 Fed. Reg. 53691 (Sept. 28, 2021) (OMB Director approval). The guidance defines a "covered contractor employee" as "any full-time or part-time employee of a covered contractor working on or in connection with a covered contract or working at a covered contractor workplace." Federal Contractor Guidance, *supra*, at 3. As of the most up-to-date guidance, covered contractor employees "must be fully vaccinated no later than January 18, 2022." *Id.* at 5.

Each federal contractor is responsible for ensuring that its employees comply with the Task Force's workplace safety protocols and must review its covered employees' documentation to prove vaccination status. *Id.* Moreover, if an employee communicates to his employer that he is not vaccinated because of a disability or sincerely held religious belief, then it is up to the federal contractor to "review and consider what, if any, accommodation it must offer." *Id.*

Executive Order 14,043 directs each federal agency to "implement . . . a program to require COVID-19 vaccination for all of its Federal employees, with exceptions only as required by law." 86 Fed. Reg. 50989.[2] It directs the Safer Federal Workforce Task Force to "issue guidance . . . on agency implementation of this requirement for all agencies covered by this

[2] The Executive Order invokes the President's power to prescribe regulations for the conduct of executive-branch employees under 5 U.S.C. §§ 3301, 3302 & 7301 as the source of his authority to issue the order.

order." *Id.* The resulting guidance advises that "[f]ederal employees need to be fully vaccinated by November 22, 2021." *Vaccinations*, Safer Federal Workforce, https://www.saferfederalworkforce.gov/faq/vaccinations (last visited Dec. 7, 2021) ("Federal Employee Guidance"). It goes on to explain that federal employees are not "considered fully vaccinated for COVID-19" until "2 weeks after they have received the requisite number of doses of a COVID-19 vaccine." *Id.* As a result, except as discussed below, federal employees were required to receive their "last dose of the vaccine by no later than November 8, 2021 to meet the November 22, 2021 deadline to be fully vaccinated." *Id.* The guidance cautions that employees who "fail to comply with a requirement to be fully vaccinated . . . and have neither received an exception or extension nor have an exception or extension request under consideration" are "subject to discipline, up to and including termination or removal." *Id.*

Termination or removal is not an immediate consequence of noncompliance. Rather, the Federal Employee Guidance advises agencies to "initiate an enforcement process to work with employees to achieve their compliance." *Id.* This process should initially include "an appropriate period of education and counseling, including providing employees with information regarding the benefits of vaccination and ways to obtain the vaccine." *Id.* "If the employee does not demonstrate progress toward becoming fully vaccinated . . . by the end of the counseling and education period," the next step is for agencies to "issue a letter of reprimand, followed by a short suspension." *Id.* If noncompliance continues during the suspension, the agency may then propose removal. *Id.*

The Federal Employee Guidance recognizes that certain federal employees may be eligible for an exception to the vaccine requirement in "limited circumstances" in which "the law requires an exception." *Id.* Specifically, "an agency may be required to provide a reasonable

accommodation to employees who communicate to the agency that they are not vaccinated against COVID-19 because of a disability or because of a sincerely held religious belief, practice, or observance." *Id.* When such cases arise, the Federal Employee Guidance provides that the agency should "follow its ordinary process to review and consider what, if any, accommodation it must offer." *Id.* If an employee's request for an exception is denied, then the employee must receive "their first (or, if a one-dose series, only), dose within two weeks of the final determination to deny the accommodation." *Id.*

**B. Plaintiff's Factual Background**

Plaintiff Ronald McCray, Jr., works full-time as a computer programmer for the Internal Revenue Service ("IRS") and part-time as a network operations support contractor for the Department of Defense, Dkt. 1 at 16 (Compl. ¶ 12); Nov. 12, 2021, Hrg. Tr. (Rough at 1, 3). As such, he alleges that he is "a federal employee and contractor within the meaning of the President's orders." Dkt. 1 at 16 (Compl. ¶ 12). Plaintiff is unvaccinated and opposes receiving the COVID-19 vaccine, Nov. 12, 2021, Hrg. Tr. (Rough at 2); he also alleges, however, that he is "naturally immune to conoravirus" because he "has already recovered from . . . COVID-19." *Id.* at 16 (Compl. ¶ 12). Plaintiff asserts that he suffered "two life-threatening heart attacks" in 2013, and that those heart attacks resulted in "life-long injuries" with which he is only able to "cope . . . through diet and exercise," although he admits that he currently is "not under the direct care of any doctor." *Id.* at 16–17 (Compl. ¶ 12). He raises a concern that "the President's order mandate [he] inject himself with vaccines known to have increased risks of heart inflammation in males of his age group." *Id.* at 16 (Compl. ¶ 12).

Plaintiff initiated this action on November 1, 2021, seeking a declaration that the President's orders are unlawful and an injunction "to prevent enforcement of the [P]resident's

orders against" him. Dkt. 1 at 129. On the same day, Plaintiff also filed a motion for a TRO against the President. Dkt. 2. In response to Plaintiff's motion, the Court ordered Plaintiff "immediately to cause copies of the summons, the complaint, and the motion for a temporary restraining order to be served on Defendant" and, "[a]s soon as counsel for the United States [wa]s identified," to "promptly contact" the Clerk of Court to "set a date for an initial status conference." Min. Order (Nov. 2, 2021). The government entered an appearance on November 5, 2021, and the Court held an initial status conference with the parties on November 12, 2021. At that conference, Plaintiff informed the Court that he remains an IRS employee and a defense contractor and has not yet had any adverse employment action taken against him. Nov. 11, 2021, Hrg. Tr. (Rough at 1–2). In addition, Plaintiff explained that he has applied for a medical exemption, but he expects his exemption to be denied because he is not currently being treated by a doctor, and he thus concededly "submitted an incomplete application." *Id.* (Rough at 1–2, 4–5). At the conclusion of the hearing, the Court set a briefing schedule on Plaintiff's motion for a TRO. Pursuant to that order, Defendant filed his opposition to the motion on November 17, 2021, Dkt. 8, and Plaintiff filed his reply on November 22, 2021, Dkt. 9.

## II. ANALYSIS

Plaintiff's complaint and motion for a TRO raise four challenges to the President's executive orders. First, Plaintiff alleges that the orders must be invalidated because they "cite the COVID-19 public health emergency as . . . justification," and, on Plaintiff's telling, the COVID-19 pandemic was improperly designated a public health emergency by the Secretary of HHS, in violation of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3(b). Dkt. 1 at 112 (Compl. ¶ 106). Plaintiff's complaint devotes approximately ninety pages to describing various publications that, he says, show that "CDC and WHO 'knowingly and willfully' devised a

fraudulent 'testing scheme' to produce 100% false-positives rate, which CDC and WHO used to arbitrarily drum up Covid-19 deaths and cases with the goal of stoking emergency of a reported novel coronavirus." *Id.* at 114 (Compl. ¶ 113) (footnotes omitted). Plaintiff also argues that this material shows that the risk of asymptomatic spread is much lower than the government has represented, *id.* at 77–101 (Compl. ¶¶ 79–91), and that natural immunity against COVID-19 is just as effective, if not more effective, than vaccine-derived immunity, *id.* at 72–77 (Compl. ¶ 68–78). In short, Plaintiff claims that the COVID-19 pandemic was unlawfully designated as a public health emergency because the severity of the pandemic was based in data the government purportedly knew to be false. Plaintiff asserts that because "[f]raud destroys the validity of everything into which it enters," both of "the President's orders are invalid as the mandates rely on a fraudulent declaration of public health emergency as justification." *Id.* at 115 (Compl. ¶ 114) (quotation marks omitted).

Second, Plaintiff contends that the President's orders violate his Fifth Amendment right to substantive due process and bodily integrity. He maintains that (1) there are "limits on governmental power to mandate medical treatment or to bar its rejection," *id.* at 117 (Compl. ¶ 120) (quotation marks omitted); (2) the government's "interest in the protection of life falls short of justifying any plenary override of individual liberty claims," *id.* (quotation marks omitted); and (3) the "forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty," *id.* at 121 (Compl. ¶ 128) (quotation marks omitted). Since, on his telling, a "fundamental right" is at issue, Plaintiff argues that the President's orders must overcome strict scrutiny. *Id.*

Third, Plaintiff claims that the orders deprive him of his Fifth Amendment right to equal protection. He maintains that the government has unlawfully discriminated on the basis of

natural immunity to COVID-19, because the order treats individuals with (what he claims are) similar forms of immunity differently by requiring the termination of individuals who have naturally acquired immunity but not those with vaccine-induced immunity. *Id.* at 123–26 (Compl. ¶¶ 138–46). Plaintiff argues that this disparate treatment is irrational, because (in his view) "the science supports the idea that natural immunity is better or as good as vaccine induced immunity." *Id.* at 125 (Compl. ¶ 141). For similar reasons, Plaintiff maintains that the President's orders violate Section 706(2) of the APA because they are "arbitrary, unlawful, contrary to constitutional rights, unsupported by substantial evidence, and without observance of procedure." *Id.* at 126–27 (Compl. ¶ 149).

A TRO is "an extraordinary form of relief." *Banks v. Booth*, 459 F. Supp. 3d 143, 149 (D.D.C. 2020). An application for a TRO is "analyzed using factors applicable to preliminary injunctive relief," *id.* (citing *Gordon v. Holder*, 632 F.3d 722, 723–24 (D.C. Cir. 2011)), and thus "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *id.* (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). In general, a plaintiff seeking preliminary injunctive relief "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alterations in original) (quotation marks omitted).

Before the Court may consider whether Plaintiff has met his burden with respect to these factors, however, the Court must first confront whether it has jurisdiction over Plaintiff's suit. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). This inquiry is antecedent to the question of preliminary relief because, where a court lacks jurisdiction, a plaintiff is "not entitled to any relief, let alone the extraordinary remedy of a preliminary

injunction." *Schindler Elevator Corp. v. Wash. Metro. Area Transit Auth.*, 514 F. Supp. 3d 197, 212 (D.D.C. 2020). As explained below, Plaintiff's motion for a TRO must be denied both because the Court lacks jurisdiction to enjoin the President and because Plaintiff's claims are unripe. In addition, because the Court's lack of subject-matter jurisdiction precludes it from taking any further action in this matter, the Court will *sua sponte* dismiss the complaint, but will do so without prejudice.

**A. Jurisdiction to Enjoin the President**

The central defect in Plaintiff's complaint is that the only defendant against whom he seeks declaratory and injunctive relief is the President of the United States. As a "threshold" matter, the Court is obligated to "evaluate[] whether injunctive relief against the President [i]s available." *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) (plurality opinion). In this case, both Supreme Court and D.C. Circuit precedent cast doubt on the availability of injunctive relief as a remedy. In *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1867), the State of Mississippi sued to enjoin President Andrew Johnson "from executing or in any manner carrying out . . . the Reconstruction Acts." *Id.* at 475. In evaluating whether the Court was vested with the authority to enjoin the President, the Court invoked fundamental principles of separation of powers. It observed that neither "Congress[,] [a]s the legislative department," nor "the President[,] [a]s the executive department[,] . . . can be restrained in its action by the judicial department; though the acts of both, when performed, are, in proper cases, subject to its cognizance." *Id.* at 500. Indeed, "[t]he impropriety of such interference [is] clear[]," the Court continued, because it would inevitably lead to an irresolvable "collision" between coequal "departments of the government." *Id.* at 500–01. Thus, the Court concluded, "this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Id.*

More than a century later, the Supreme Court cited favorably to this analysis in *Franklin v. Massachusetts*, 505 U.S. 788 (1992). Quoting *Johnson*, the plurality opinion in *Franklin* confirmed that, "in general," a court "has no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Id.* at 802–03 (quoting 71 U.S. (4 Wall.) at 501). The plurality, moreover, couched this jurisdictional defect in terms of standing, indicating that because an injunction is unavailable against the President, plaintiff's injuries cannot be redressed through that avenue. *See id.*; *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (explaining that, to establish standing, (1) the plaintiff "must have suffered an 'injury in fact;'" (2) "there must be a causal connection between the injury and the conduct complained of;" and (3) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision'"). The plurality opinion in *Franklin* garnered only four votes. *See* 505 U.S. at 789–90. But the proposition that courts lack the power to enjoin the President garnered five, as Justice Scalia agreed in his concurrence that "no court has authority to direct the President to take an official act." *Id.* at 826 (Scalia, J., concurring in part and concurring in the judgment).

*Franklin*, however, did not absolutely slam the door shut on presidential injunctions. For one thing, the plurality prefaced the proposition that courts lack jurisdiction to enjoin the President with the qualifier "in general." *Id.* at 802 (plurality opinion). In addition, the plurality and Justice Scalia observed that *Johnson* had "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty." *Id.* at 802; *id.* at 827 n.2 (Scalia, J., concurring in part and concurring in the judgment). And, the plurality's discussion about the Court's powerlessness to enjoin the President was arguably dicta, since, at the end of the day, the plurality concluded that it "need not decide whether injunctive

relief against the President was appropriate" because the injury the plaintiff alleged was "likely to be redressed by declaratory relief against the Secretary [of Commerce] alone." *Id.* at 803 (plurality opinion). Thus, *Franklin* arguably leaves open the possibility that an injunction against the President might be appropriate where a ministerial duty is at issue or as a last resort in situations where relief is not available against any other executive official.

D.C. Circuit precedent largely tracks the limits of the *Franklin* analysis. In *Swan v. Clinton*, for example, the D.C. Circuit acknowledged *Franklin*'s caveat about ministerial duties, but then observed, "[w]e have . . . never attempted to exercise power to order the President to perform a ministerial duty." 100 F.3d 973, 978 (D.C. Cir. 1996). Although the court acknowledged that some of its "earlier decisions" had "asserted the authority to issue such an order," it noted that even those cases ultimately "declined to exercise the power so claimed." *Id.* The *Swan* court did recognize, however, a tension between the "risks" to "the constitutional separation of powers" posed by an injunction against a "coequal branch," on the one hand, and "the bedrock principle that our system of government is founded on the rule of law," on the other. *Id.* Thus, the *Swan* court appeared to leave open the possibility that a suit to enjoin the President *might* be available as a last resort. In the end, however, the *Swan* court determined that, as in *Franklin*, it did not need to decide whether an injunction against the President is always improper, because "injunctive relief against [subordinate] officials could substantially redress [the plaintiff's] injury." *Id.* at 979.

In *Newdow v. Roberts*, the D.C. Circuit broadly observed that courts "do[] not sit in judgment of a President's executive decisions," 603 F.3d 1002, 1012 (D.C. Cir. 2010), and "do not have the jurisdiction to enjoin him," *id.* at 1013. But, the court made both of these observations in dicta. The plaintiffs in *Newdow* did not name the President as a defendant;

instead, they sought to enjoin all current and future individuals whom the President might task with administering presidential inaugurations from including references to God in the inauguration ceremony, including in the oath of office. *Id.* at 1006–08. The court rejected that claim for two reasons: First, the court held that because plaintiffs had sought to enjoin an unidentifiable number of defendants, they had improperly requested a general injunction "against the world" that was "not within the power of the courts." *Id.* Second, the court concluded that plaintiffs' claims were not redressable because the defendants "possess[ed] no authority—statutory or otherwise—to actually decide whether future inaugural ceremonies will contain the offending religious elements," since only the President and President-elect make those decisions and the plaintiffs had not named them as defendants. *Id.* at 1011. Only after resolving the case on these grounds did the *Newdow* court observe that the "only apparent avenue of redress for plaintiffs' claimed injuries would be injunctive or declaratory relief against all possible President-elects and the President himself" and that such relief would be unavailable because of the court's lack of power to enjoin the President. *Id.* at 1013.

For present purposes, this Court need not decide whether the judicial power might in truly extraordinary circumstances permit a Court to enjoin the President, because—by any measure—this is not such a case. Here, neither of the President's executive orders qualifies as a ministerial action. Both orders are discretionary actions undertaken as part of the President's official duties. And, here, as in *Franklin* and *Swan*, an injunction against the President is not the only possible avenue for relief, since Plaintiff may sue other executive officials who are tasked with enforcing the President's orders.

The discussion thus far has centered on Plaintiff's request for injunctive relief. Plaintiff, however, has asked the Court not just for an injunction, but also for a declaration that the

President's actions are unlawful. Neither *Johnson* nor *Franklin* considered whether declaratory relief is available against the President. In his concurrence in *Franklin*, Justice Scalia wrote that declaratory relief is unavailable against the President, *see* 505 U.S. at 827–28 (Scalia, J., concurring in part and concurring in the judgment), but his opinion garnered only one vote. The D.C. Circuit, in contrast, did address declaratory judgments in both *Swan* and *Newdow*. In *Swan*, the court reasoned that "similar considerations regarding a court's power to issue relief against the President himself apply to [a] request for a declaratory judgment," and so the court concluded that neither injunctive nor declaratory relief was available against the President in that case. 100 F.3d at 976–77 n.1. Similarly, in *Newdow*, the D.C. Circuit observed that "court[s]—whether via injunctive *or declaratory relief*—do[] not sit in judgment of a President's executive decisions," 603 F.3d at 1012 (emphasis added), and noted in passing that "courts have never submitted the President to declaratory relief," *id.* at 1013. As another judge on this Court has pointed out, *see Citizens for Resp. & Ethics in Wash. v. Trump*, 302 F. Supp. 3d 127, 139 n.6 (D.D.C. 2018), that latter point admits of at least one exception; the D.C. Circuit subjected the President to declaratory relief in *National Treasury Employees Union v. Nixon (NTEU)*, 492 F.2d 587, 616 (D.C. Cir. 1974). However, even though *Newdow* did not address *NTEU*, the D.C. Circuit had previously discussed the case in *Swan*, where the court wrote that it was "not entirely clear" whether *NTEU* "remain[ed] good law" after *Franklin*, although it ultimately did not decide the issue. *Swan*, 100 F.3d at 978. In any event, as discussed, *Newdow*'s passing observations concerning the judicial power to enjoin the President were made in dicta, since the President was not a defendant in that case. The *Swan* decision, moreover, appears to leave open the possibility, as *Franklin* does, that an injunction—and consequently a declaration—*might* be available against the President in extraordinary cases. That being said, once again, the Court need not decide this

issue here, because it is clear that a declaratory judgment is not available to Plaintiff, both because the conduct at issue does not involve a ministerial duty of the President, and because relief is available against other executive officials and so the President has not been sued as a last resort.

As a result, under controlling Supreme Court and D.C. Circuit precedent, the Court concludes that Plaintiff lacks standing to seek an injunction or declaratory judgment against the President, and so the Court lacks Article III jurisdiction over this case—at least as it is currently framed. Since the absence of jurisdiction prevents the Court from granting relief, *Schindler Elevator Corp.*, 514 F. Supp. 3d at 212, the Court denies Plaintiff's motion for a TRO. The Court is also obligated to go one step further, however. Although the government has not moved to dismiss Plaintiff's complaint, "[w]ithout jurisdiction, the court cannot proceed at all," and so "the only function remaining is . . . [to] announc[e] th[at] fact and dismiss[] the cause." *Steel Co.*, 523 U.S. at 94 (quotation marks omitted). The D.C. Circuit has held that, in the context of "a preliminary injunction," if "a litigant cannot establish standing as a matter of law, the proper course is . . . dismissal." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Commerce*, 928 F.3d 95, 104 (D.C. Cir. 2019) (emphasis omitted). Accordingly, the Court must, in addition to denying the TRO, dismiss Plaintiff's complaint *sua sponte* for lack of subject-matter jurisdiction.

Of course, it is important to clarify that none of the foregoing discussion should be interpreted to mean that presidential executive orders are immune from injunctive or declaratory relief. Indeed, to the contrary, notable examples of such cases abound. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935); *Chamber of Com. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996). But the critical lesson is that, in such litigation, the proper course is to seek to enjoin a member of the executive branch from

carrying out the executive order at issue, not the President. *See Franklin*, 505 U.S. at 802 (citing *Youngstown*, 343 U.S. 579). With this in mind, the Court will dismiss Plaintiff's complaint without prejudice, because it may be possible for Plaintiff to raise his claims against a different executive branch official other than the President.

**B. Ripeness**

Even if Plaintiff were to amend his complaint to enjoin officials other than the President, however, the Court would still lack jurisdiction at this time because Plaintiff's claims are not yet ripe for adjudication. "Ripeness is a justiciability doctrine designed 'to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies.'" *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)); *see also Davis v. Nuclear Regul. Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007). The doctrine is premised, in part, on Article III's case or controversy limitation and, in part, on prudential considerations "for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 808 (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993)).

At a "constitutional minim[um]," *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999), the doctrine of ripeness "prohibits courts from issuing advisory opinions on speculative claims," *Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1007 (D.C. Cir. 2014). This aspect of the ripeness doctrine is closely related to and, indeed, "subsumed into the Article III requirement of standing, which requires a petitioner to allege *inter alia* an injury-in-fact that is 'imminent' or 'certainly impending.'" *Am. Petrol. Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012). Thus, "[a] claim is not ripe for adjudication if it rests upon

contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation marks omitted).

Plaintiff's claims must be dismissed because they fail to identify a non-speculative dispute that is ripe for adjudication. Rather, Plaintiff's purported injury is contingent upon his employers denying his application for a medical exemption. This is a "contingent future event[] that may not occur as anticipated, or indeed may not occur at all." *Texas*, 523 U.S. at 300 (quotation marks omitted).

Plaintiff has represented to the Court that he "put in" for "medical exemptions" because of his heart condition and "the paperwork is working its way through." Nov. 11, 2021, Hrg. Tr. (Rough at 2). The Task Force's guidance currently lists certain heart conditions among the bases for a medical accommodation recommended by the CDC. *See* Federal Employee Guidance, *supra*. While Plaintiff's request remains pending, he does not face an "imminent or certainly impending injury," *Chlorine Inst., Inc. v. Fed. R.R. Admin.*, 718 F.3d 922, 927 (D.C. Cir. 2013), because, as the government represented at the initial status conference, the "deadline [to become vaccinated] does not apply to anybody who . . . has an exemption pending and under consideration," and those employees "won't be subject to discipline" during the pendency of their applications. Nov. 12, 2021, Hrg. Tr. (Rough at 9); *see also* Federal Employee Guidance, *supra*; Federal Contractor Guidance, *supra*, at 5; Dkt. 8 at 23.

At the November 12, 2021, status conference, Plaintiff indicated that he expects that his request for an exemption will be denied because he "do[es]n't have a doctor" and therefore "submitted an incomplete application." Nov. 12, 2021, Hrg. Tr. (Rough at 4). Without knowing more about the documentation that Plaintiff has submitted or about Plaintiff's employers' policies and process for assessing for medical exemptions, however, the Court cannot know (or

even reasonably predict) whether Plaintiff's request will, in fact, be denied, or, if so, on what basis. Any denial that results from the incompleteness of Plaintiff's application, moreover, might be cured by seeking an examination from a doctor and supplementing his application with the appropriate supporting documents. And, if Plaintiff were to fail to do so, it is likely that his waiver application would not be denied on the merits, but, rather, for failure to comply with the mandated procedures. The "mere potential" that Plaintiff might suffer a future injury is insufficient to "render an issue ripe for review." *Friends of Keeseville, Inc. v. FERC*, 859 F.2d 230, 236 (D.C. Cir. 1988) (emphasis omitted).

Finally, it is not clear whether Plaintiff's federal contractor employer is covered by the President's Executive Order. By its terms, Executive Order 14,042 applies only to "new contracts," "new contract-like instruments," "new solicitations for contracts or contract-like instruments," "extensions or renewals of existing contracts or contract-like instruments," and "exercises of options on existing contracts or contract-like incidents" that are entered into "on or after October 15, 2021." 86 Fed. Reg. 50987. Plaintiff has not provided any evidence concerning whether his contractor-employer's relationship with the federal government meets this definition, and so the Court cannot be certain whether Plaintiff will suffer any adverse consequence related to his federal-contractor employment.

Under these circumstances, Plaintiff's request for emergency relief is not ripe.[3] At bottom, Plaintiff "complain[s] of a compulsory inoculation [he] may never need to take, and of

---

[3] Although not necessary to decide the present motion, the Court observes that there may be other jurisdictional barriers to Plaintiff's suit, in addition to the President's immunity from injunctive relief and the lack of ripeness of Plaintiff's claims. For example, the Court may lack jurisdiction over Plaintiff's challenge to Executive Order 14,043 in his capacity as an employee of the IRS. In *Elgin v. Department of the Treasury*, 567 U.S. 1 (2012), the Supreme Court held that the exclusive avenue for review of final adverse action against federal employees covered by

adverse employment action[] [he] may never experience." *Church v. Biden*, No. 21-cv-2815, 2021 WL 5179215, at *1 (D.D.C. Nov. 8, 2021). "This uncertainty weighs decisively against the ripeness of Plaintiff['s] claims," *id.*, and so the Court concludes that even if Plaintiff were to add defendants other than the President, it would lack subject-matter jurisdiction at this time.[4]

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for a temporary restraining order, Dkt. 2, is hereby **DENIED**, and Plaintiff's complaint, Dkt. 1, is **DISMISSED** without prejudice for lack of subject-matter jurisdiction.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: December 7, 2021

---

the Civil Service Reform Act of 1978, 5 U.S.C. § 1101 *et seq.*, is through a hearing before the Merit Systems Protection Board and, if necessary, appeal to the United States Court of Appeals for the Federal Circuit. *Elgin*, 567 U.S. at 5–6, 12–13; *see* 5 U.S.C. §§ 7511(a)(1), 7512, 7513(d), 7703(a)(1). At present, however, the record is not clear as to whether Plaintiff is a "competitive service" or "excepted service" employee to whom the Civil Service Reform Act's statutory review scheme applies. *See* 5 U.S.C. § 7511.

[4] The Court recognizes that there is substantial overlap between the constitutional aspect of the ripeness doctrine and the "irreparable injury" element of the TRO factors, *see, e.g.*, *Time Warner Ent. Co. L.P. v. FCC*, 810 F. Supp. 1302, 1304 n.5 (D.D.C. 1992), which constitutes "the *sine qua non* for obtaining a preliminary injunction," *Jubilant DraxImage Inc. v. U.S. Int'l Trade Comm'n*, 396 F. Supp. 3d 113, 123 (D.D.C. 2019). Because of this overlap, the Court's ripeness analysis necessarily tracks the irreparable injury analysis. But, since courts must first consider their jurisdiction before reaching the merits of a case, the Court has limited its discussion of Plaintiff's lack of irreparable injury here to the ripeness of Plaintiff's claims.